**Walter SPENCER and Patricia Spencer, husband and wife, t/a Manitou Mountain Resort, Plaintiffs,**

**v.**

**RESORTS AND SPAS, LTD., t/d/b/a Weight Watchers Resorts and Spas, Ltd., a Corporation, and Weight Watchers International, Inc., a Corporation, Defendants.**

Civ. No. 86–1629.

United States District Court, M.D. Pennsylvania, Third Circuit Division.

Jan. 20, 1988.

neously determined that section 4285 provided

Carl J. Poveromo, Patrick J. Mellody, Rinaldi, Fendrick & Mellody, P.C., Scranton, Pa., for plaintiffs.

Susan Cutright, Wilkes–Barre, Pa., for other defendants.

Howard M. Levinson, Wilkes–Barre, Pa., for Weight Watchers Intern., Inc.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Presently before the court is the motion for summary judgment of defendant Weight Watchers International, Inc. (Weight Watchers). For the reasons set forth below, the motion will be denied.

## FACTS

Plaintiffs instituted this action on November 14, 1986. According to their complaint, they owned and operated a resort facility known as the Manitou Mountain Resort in Stroudsburg, Pennsylvania. By written agreement dated March 28, 1986 and executed by plaintiff Patricia Spencer and the executive vice-president of defendant Resorts and Spas, Ltd. (Resorts and Spas), plaintiffs leased their resort facility to Resorts and Spas for two (2) eleven (11) consecutive week periods commencing on June 15, 1986 and June 15, 1987, respectively.

It is undisputed that a franchise relationship exists between Weight Watchers (the franchisor) and Resorts and Spas (the franchisor) and Resorts and Spas (the fran-

the authority for round-trip payments.

chisee). Plaintiffs maintain that although Weight Watchers is not a named party in the March 28, 1986 lease agreement, Weight Watchers is nonetheless bound by the terms of that contract by virtue of its control over Resorts and Spas. Specifically, plaintiffs allege that Resorts and Spas entered the lease agreement "with the consent and authority of Weight Watchers" and that Weight Watchers "regulated the operations of [Resorts and Spas] pursuant to a license under which Resorts and Spas was authorized to carry on business in the name of Weight Watchers International and use the 'Weight Watchers' name and trademark." *See* complaint at ¶¶ 2–3.[1]

According to plaintiffs, defendants terminated the March 28, 1986 lease agreement on September 17, 1986. Plaintiffs claim that they complied with all terms of the contract and that defendants' termination of the lease agreement was improper and constituted a breach of contract. Defendants filed a counterclaim in which they aver that plaintiffs misrepresented the condition of the resort and failed to provide essential services and facilities required under the contract.

Weight Watchers has moved for summary judgment on plaintiffs' claims against it. Weight Watchers asserts that its license agreement with Resorts and Spas does not create an agency relationship between Weight Watchers and Resorts and Spas and that Resorts and Spas had no authority to create or assume any obligation on behalf of Weight Watchers or to act as Weight Watchers' legally empowered representative.

The parties have briefed the relevant issues, and Weight Watchers' motion for summary judgment is now ripe for disposition.

## DISCUSSION

When faced with a summary judgment motion, a district court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the party opposing the motion. *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The court must view all facts in the light most favorable to the party opposing the motion. *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402, 404 (3d Cir.1981).

The law of Pennsylvania applies to this diversity case. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "Under Pennsylvania law, when an injury is done by an 'independent contractor,' the person employing him is generally not responsible to the person injured." *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 785 (3d Cir.1978) (citing *Hader v. Coplay Cement Mfg. Co.*, 410 Pa. 139, 150–51, 189 A.2d 271, 277 (1963)). "However, when the relationship between the parties is that of 'master-servant' or 'employer-employee' as distinguished from 'independent contractor-contractee,' the master or employer is vicariously liable for the servant's or employee's negligent acts committed within the scope of his employment." *Drexel*, 582 F.2d at 785 (citing *Smalich v. Westfall*, 440 Pa. 409, 415, 269 A.2d 476, 481 (1970)). In the *Drexel* case, the Third Circuit identified the basic inquiry which Pennsylvania courts have utilized to determine whether a particular individual or entity is an employee-servant or an independent contractor:

'[T]he basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged.... The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the man-

---

1. Plaintiffs have not indicated whether they are pursuing an apparent agency theory in addition

to their theory that an actual agency/joint venture relationship existed between defendants.

ner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.' *Drexel*, 582 F.2d at 785 (quoting *Green v. Independent Oil Co.*, 414 Pa. 477, 483–84, 201 A.2d 207, 210 (1964)). "Actual control over the manner of work is not essential; rather, it is the *right to control* which is determinative" (emphasis supplied). *Drexel*, 582 F.2d at 785 (citing *Coleman v. Board of Education*, 477 Pa. 414, 421–22, 383 A.2d 1275, 1279 (1978)).

Where the alleged master and servant occupy the status of franchisor and franchisee, respectively, "[s]ome degree of control by the franchisor over the franchisee would appear to be inherent in the franchise relationship...." *Drexel*, 582 F.2d at 786. Nonetheless, "the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship." *Id.* Accordingly, "[w]hether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." *Id.* Moreover, "[t]he fact that the franchise agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter." *Id. See also Drummond v. Hilton Hotel Corp.*, 501 F.Supp. 29, 31 (E.D.Pa.1980).

In the *Drexel* case, the defendant occupied the status of franchisor by virtue of a written franchise agreement. The franchise bore the name of the defendant, but the defendant disclaimed any ownership or control over the franchisee. Consequently, the defendant moved for summary judgment, denying all liability for any negligence on the part of the franchisee. The district court granted summary judgment, and the Third Circuit reversed that decision. Despite a provision in the franchise agreement which stated that the liability of the defendant was strictly limited, the Third Circuit concluded that other clauses in the franchise agreement could be interpreted as reserving to the defendant the right to control facets of the franchisee's operations. In particular, the Third Circuit determined that the agreement was "so broadly drawn as to render uncertain the precise nature of [the franchisor's] rights vis-a-vis its franchisee" and that further evidence was necessary to ascertain what the parties meant by the terms of the agreement. *Drexel*, 582 F.2d at 788. The court was influenced by clauses in the franchise agreement which apparently gave the defendant the right to inspect the franchisee's premises and to control, *inter alia*, the franchisee's location, appearance, inventory, equipment, business hours and methods of operation and accounting. The court concluded that the issue of the defendant's right to control the franchisee's operations "cannot be resolved conclusively on the present record without drawing inferences favorable to the moving party, which is forbidden in ruling on a motion for summary judgment." *Drexel*, 582 F.2d at 789.

In the present case, Weight Watchers asserts as grounds for its summary judgment motion that (1) it was not a party to the March 28, 1986 lease agreement between plaintiffs and Resorts and Spas and (2) the franchise agreement between Weight Watchers and Resorts and Spas, which is the only contract between these two entities, provides at paragraph 3.1:

> The Licensor and the Licensee intend by this agreement to establish the relationship of licensor and licensee, and it is not the intention of any party hereto that the Licensor will undertake hereby a joint venture with the Licensee or to make the Licensee in any sense an agent for the Licensor. Except as provided for herein neither the Licensor nor the Licensee has authority to create or assume in the name or on the behalf of the other, any obligation, whether express or implied, nor to act or purport to act as the agent or legally empowered representative of the other for any purpose whatsoever.

*See* exhibit 1 attached to document 34 of the record. On the basis of the above information, Weight Watchers concludes that it cannot be subject to any obligations arising from the lease agreement between plaintiffs and Resorts and Spas.

As noted by the Third Circuit in the *Drexel* case, "[t]he fact that the franchise agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter." *Drexel,* 582 F.2d at 786. Furthermore, plaintiffs, who submitted the full text of the franchise agreement between the defendants along with the deposition testimony of Weight Watchers' vice-president of franchised and licensed operations, correctly point out that numerous clauses in the franchise agreement are ambiguous and could be construed as reserving for Weight Watchers the right to control at least a significant portion of the operations of Resorts and Spas. *See* plaintiffs' brief in opposition at pp. 7–13. For example, the franchise agreement between the defendants specifies, *inter alia,* that:

1. Resorts and Spas is granted a license to use Weight Watchers' trademarks and techniques in connection with the operation of adult camps and spas in a specified territory (franchise agreement at ¶ 1.1).

2. Attendees of the spas must fall within age, weight and minimum enrollment period requirements established by Weight Watchers (¶ 1.1).

3. Resorts and Spas must offer attendees of the spas weight reduction classes and other activities specified by Weight Watchers and is further required to obtain written approval from Weight Watchers before offering attendees additional activities (¶¶ 1.2 and 1.3).

4. Resorts and Spas must submit monthly reports of its gross sales to Weight Watchers on the latter's prescribed forms (¶ 4.3).

5. Resorts and Spas must use only Weight Watchers' trademarks in connection with the operation of the spas (¶ 7.2).

6. Resorts and Spas shall not authorize the printing of any literature nor utilize any advertising which has not been previously approved by Weight Watchers (¶ 7.3).

7. Resorts and Spas shall not change its corporate name without written consent from Weight Watchers (¶ 7.4).

8. Resorts and Spas shall only operate spas at locations approved in writing by Weight Watchers (¶ 8.1 et seq.).

9. Resorts and Spas shall maintain the physical premises of the spas in a first-class manner and shall not materially alter the appearance of the spas without prior written approval from Weight Watchers (¶ 9.1).

10. Resorts and Spas shall not depart from the substance and manner of operation as set forth in Weight Watchers' adult camp and spa manuals without prior approval from Weight Watchers (¶ 9.2).

11. Resorts and Spas shall not offer any program or product for sale by mail without the consent of Weight Watchers (¶ 9.2).

12. Resorts and Spas shall not offer or allow any activity or service, or distribute, or sell, or allow the sale or distribution of any product without prior written consent from Weight Watchers (¶ 9.2).

13. Resorts and Spas shall not relinquish substantial control over the management of the spas to a third party without prior written consent from Weight Watchers (¶ 9.2).

14. Resorts and Spas shall maintain the equipment used in the spas in excellent working condition (¶ 9.3).

15. Resorts and Spas shall operate the spas in accordance with the standards, specifications and procedures set forth in Weight Watchers' operational manual and agrees to accept such changes, modifications, revisions and additions to the operational manual which Weight Watchers deems necessary (¶ 9.4).

16. No activities, products or services shall be sold, offered for sale or dis-

tributed without charge in the spas without written consent from Weight Watchers (¶ 9.7).

17. Resorts and Spas shall keep books of account in accordance with good accounting practice and generally accepted accounting principles and shall deliver an annual report of its gross income to Weight Watchers (¶ 9.10).

18. Resorts and Spas shall insure that the weight of each of its employees shall not exceed limitations prescribed by Weight Watchers (¶ 9.12).

19. Weight Watchers shall have the right to enter all spas to conduct reasonable quality control activities to ascertain compliance with the agreement (¶ 9.13).

20. The owners of Resorts and Spas or their designee approved by Weight Watchers shall attend up to three meetings per year called by Weight Watchers (¶ 9.14).

21. All spas shall be open for attendance by the public for not less than seven consecutive weeks each calendar year except for circumstances beyond the control of Resorts and Spas (¶ 9.16).

22. Resorts and Spas shall, upon the request of Weight Watchers, furnish to Weight Watchers in writing statistical and background information with respect to any employee who performs any service at one of the spas (¶ 9.18).

23. All foods and beverages at the spas shall be selected, prepared and served in accordance with the weight reduction eating regimen specified by Weight Watchers (¶ 9.19).

24. All menu plans used by Resorts and Spas at any of the spas shall be approved in writing by Weight Watchers (¶ 9.20).

25. Resorts and Spas shall furnish Weight Watchers with a monthly and fiscal year report in the format prescribed by Weight Watchers in regard to sales and receipts and a breakdown thereof (¶ 10.1).

26. Upon five days notice, Weight Watchers shall have the right to examine and audit the books and accounts of Resorts and Spas (¶ 10.2).

27. Any designated representative of Resorts and Spas shall be subject to the prior written consent of Weight Watchers (¶ 14.1).

28. Weight Watchers possesses a certain degree of control over the ownership and transferability of the stock in Resorts and Spas (¶ 14.1).

*See* exhibit 1 attached to document 34.[2] The court queries, for example, what is actually meant by such terms as "first-class manner" and "materially alter" in paragraph 9 above, "substance and manner of operation as set forth in Weight Watchers' adult camp and spa manuals" in paragraph 10, "reasonable quality control activities" in paragraph 19 and "statistical and background information" in paragraph 22. Furthermore, Weight Watchers' vice-president of franchised and licensed operations testified in his deposition that the provisions of the franchise agreement are mandatory, that a staff member of Weight Watchers conducted a quality control inspection of the Manitou Mountain Resort in the summer of 1986 and that Weight Watchers' franchisees "don't do anything in regard to the ... programs" without Weight Watchers' approval. *See* document 34 at 26–27, 60–61 and 70–71. Finally, the right to inspect and to approve the hiring of an employee, *viz.*, a "designated representative," are important factors in determining the existence of a master-servant relationship. *See George v. Nemeth,* 426 Pa. 551, 556, 233 A.2d 231, 233 (1967); *Cox v. Caeti,* 444 Pa. 143, 148, 279 A.2d 756, 758 (1971).

**2.** The portions of the franchise agreement between the defendants described above are not necessarily direct quotations from that agreement. Moreover, the above list of clauses from the franchise agreement which could be construed as giving Weight Watchers the right to control the operations of Resorts and Spas is not exclusive.

The franchise agreement is dated October 27, 1985. It has a duration of forty (40) years, with two (2) additional twenty (20) year options.

In view of the terms from the franchise agreement enumerated above and the uncertainty as to their meaning, the court is unable to conclude as a matter of law on the present record that Weight Watchers did not have the right to control the operations of Resorts and Spas or that Weight Watchers was not the "master" of Resorts and Spas. While Weight Watchers contends that it "basically did not care how Resorts and Spas chose to run its business, or with whom," *see* document 36 at 6, the extent of Weight Watchers' right to control the operations of Resorts and Spas is a jury question. Therefore, Weight Watchers' motion for summary judgment will be denied.

An appropriate Order will enter.